# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-0417-WCA

KATHERINE WILLIAMS

VERSUS

TIOGA MANOR NURSING HOME

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 02
PARISH OF RAPIDES, NO. 06-08296
HONORABLE JAMES BRADDOCK
WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED AS AMENDED.**

George A. Flournoy
Flournoy & Doggett (APLC)
P. O. Box 1270
Alexandria, LA 71309
(318) 487-9858
COUNSEL FOR PLAINTIFF/APPELLANT:
    Katherine Williams

Lawrence B. Frieman
Janna C. Bergeron
Juge, Napolitano, Guilbeau, Ruli,
Frieman & Whiteley
3320 West Esplanade Avenue North
Metairie, LA 70002
(504) 831-7270
COUNSEL FOR DEFENDANT/APPELLEE:
    Tioga Manor Nursing Home

PETERS, J.

The plaintiff in this workers' compensation litigation, Katherine Williams, suffered a work-related back injury in 2003, while employed by the defendant, Tioga Manor Nursing Home (Tioga Manor). She re-injured her back in 2005, and this event is the basis of the litigation now before us. Following a trial on the merits, the workers' compensation judge (WCJ) rendered judgment in Ms. Williams' favor on a multitude of issues, and both parties have sought relief from that judgment in this court. In her appeal, Ms. Williams raises three assignments of error while, in its answer to the appeal, Tioga Manor raises eight. For the following reasons, we amend the WCJ's judgment and affirm it as amended.

## DISCUSSION OF RECORD

Both the work history and medical history giving rise to this litigation are rather straight forward and generally undisputed. It is the interpretation of these histories that creates the issues now before us.

The evidence establishes that Ms. Williams first injured her back on August 28, 2003, while assisting a patient from a wheelchair. At the time, Tioga Manor employed her as a certified nurse's aide. On September 17, 2003, Tioga Manor commenced paying Ms. Williams temporary total disability (TTD) benefits in the amount of $127.05 per week, based on an average weekly wage of $190.57. She received treatment for this initial injury from Dr. Robert Smith, an Alexandria, Louisiana specialist in occupational industrial medicine, and Dr. M. Lawrence Drerup, an Alexandria, Louisiana neurosurgeon.

Dr. Drerup diagnosed this injury as a herniated disc at L5-S1, on the right, and Ms. Williams underwent a minimally invasive microdiskectomy on October 22, 2003. Her surgery was considered to be successful and, on December 9, 2003, Dr. Drerup

released her to return to work performing only light duty. Dr. Smith withdrew all restrictions on February 18, 2004, and she returned to her employment with Tioga Manor without restrictions.

However, her return to work was short lived. In May and June 2004, she began experiencing pain in her lower back, and Dr. Smith restricted the amount of weight she could lift while working. On October 18, 2004, Dr. Smith noted that Ms. Williams had suffered an acute onset of pain in her lower back and he restricted her from working at all. However, when he saw her two days later, her condition had improved significantly, and he modified her restrictions by suggesting that she should lift no more than ten to fifteen pounds while working.

On October 25, 2004, Dr. Smith noted that Ms. Williams was eager to return to work and that her lower back was non-tender, had palpable spasms, and that she had a slight decreased range of motion on forward flexion. Based on these findings, Dr. Smith released her to return to work, and Tioga Manor stopped her indemnity benefits effective October 21, 2004.

On February 23, 2005, Ms. Williams presented herself to Dr. Smith's physician assistant with complaints of lower back, right buttock, and right leg pain. She received two injections for pain, inflamation, and muscle spasm, and Dr. Smith ordered an MRI of her lumbar spine. Although her status that day was reported as "working," Dr. Smith restricted her from working. Effective February 23, 2005, Tioga Manor reinstated Ms. Williams' indemnity benefits at the rate of $180.00 per week.

On March 10, 2005, after an unsuccessful left S1 nerve root block, Ms. Williams complained to Dr. Smith of left leg pain and spasms and tenderness to

2

palpation at L3 through S2. The straight leg raising test produced positive results on the left side, and Dr. Smith's impression was that she suffered from L5 radiculopathy and lumbar and left leg spasms. He continued to restrict Ms. Smith from working.

On March 29, 2005, Dr. Drerup ordered EMG nerve conduction studies of her left leg, x-rays with lateral flexion and extension views of her lumbosacral spine, and a lumbar myelogram with a post-myelographic CT scan. By June 28, 2005, Dr. Drerup noted that Ms. Williams' condition had improved. Although she still suffered from intermittent lower back pain, she no longer suffered from leg pain. The EMG nerve conduction studies revealed very mild S1 radiculopathy on the left, whereas the lumbar myelogram and post-myelographic CT scan demonstrated postoperative changes at L5-S1 on the right, but was otherwise unremarkable.

In an August 22, 2005 phone conversation and by a September 1, 2005 letter, Employers Risk Management Services (Employers Risk), Tioga Manor's workers' compensation administrator, informed Dr. Smith that he was no longer authorized to treat Ms. Williams as she was still being treated by Dr. Drerup. The letter stated that treatment by Dr. Smith would not be authorized until Dr. Drerup released Ms. Williams from his care.

Despite the fact that Tioga Manor had expressed its intention to cease authorization of Dr. Smith's treatment, he continued to treat his patient. When he did see Ms. Williams in August and September 2005, his opinion of her working ability remained the same, and this opinion was supported by the results of an MRI that revealed a recurrent right-sided disc herniation at L5-S1. On September 16, 2005, Dr. Drerup noted that Ms. Williams' complaints of lower back pain continued, and she now complained of pain in both legs, the left worse than the right. As a result, he

ordered an S1 nerve root block bilaterally and an MRI of the lumbar spine. At a November 10, 2005 visit, Ms. Williams complained to Dr. Smith of pain in the dorsal aspect of her right leg. This time, the straight leg raising test proved positive bilaterally, and he noted that she had a discrete S1 radiculitis. On November 18, 2005, Dr. Drerup noted lumbar radiculopathy bilaterally, secondary to a recurrent disc herniation on the right at L5-S1.

Less than two weeks later, on November 30, 2005, Ms. Williams presented herself to the Rapides Regional Medical Center emergency room complaining of severe back and right leg pain. She was diagnosed by the emergency room physician as suffering from a degenerative disc, right-sided acute sciatica, and radiculopathy, and was given an injection of Toradol for pain.

Dr. Smith again saw Ms. Williams on February 15, 2006, and after recording her complaints and examining her, he recommended that she be seen by Dr. Stephen Katz, an Alexandria, Louisiana pain management specialist, for management of her chronic pain, and Dr. James Quillin, an Alexandria, Louisiana psychologist, for evaluation of her depression and somatization. Employers Risk denied this request via a February 23, 2006 letter. In the letter, it stated that it had previously mailed numerous letters to Dr. Smith noting that no further treatment would be authorized by him, as Ms. Williams' care had been referred to Dr. Drerup.

On April 3, 2006, Dr. Drerup performed a microdiskectomy on Ms. Williams. This procedure relieved her lower back pain, but her right leg pain continued. On June 15, 2006, Dr. Drerup noted that from a neurosurgical standpoint, he had very little to offer Ms. Williams short of a lumbar interbody fusion. After conferring, he and Dr. Smith agreed to refer her to Dr. Katz for management of her pain and to Dr.

4

Quillin for psychological intervention. By July 2006, Dr. Quillin was of the opinion that Ms. Williams was suffering from major depression and chronic pain syndrome.

Despite the seemingly bleak medical prognosis, by the time Dr. Smith saw her on July 18, 2006, Ms. Williams' pain had improved significantly. In fact, it had improved to such an extent that Dr. Smith acquiesced to her request and released her to work. However, he conditioned his release to that of a sedentary level of work as defined by the United States Department of Labor. Given her restricted release, Ms. Williams began working at The Summit Retirement Center in Alexandria, Louisiana on July 24, 2006, and continued working there through August 17, 2006, earning $6.40 per hour. Dr. Drerup released Ms. Williams on August 11, 2006, to return to work as a sitter, to activity as she could tolerate. Her indemnity benefits were terminated by Tioga Manor on August 8, 2006, pursuant to Dr. Smith's release. After her employment with The Summit Retirement Center ended, Ms. Williams worked for Matthews Memorial Nursing Home in Alexandria, Louisiana from late August through November 2006.

On November 3, 2006, Ms. Williams returned to Dr. Smith after suffering two weeks of intermittent right leg pain. Dr. Smith noted that it was difficult to assess her motor function due to the pain in her legs, and he reported that a straight leg raise test was exquisitely positive on the right and was positive for pain on the left at ninety degrees. On November 7, 2006, he stated that he was having trouble keeping Ms. Williams comfortable and that he had ordered an MRI, which had not been done. He opined that her lumbar spine showed an anterior spondylolithiasis at L5-S1, and he noted a significant loss of normal lordotic curve in her spine. Ms. Williams was

5

restricted from working by Dr. Smith. She requested that Tioga Manor reinstate her indemnity benefits as of that date. Tioga Manor refused to reinstate her benefits.

On November 9, 2006, Dr. Drerup noted that Ms. Williams complained of spasms affecting her right buttock and the posterior lateral aspect of her right leg. He found these symptoms suggestive of L5 root syndrome on the right. He recommended a lumbar myelogram and post-myelographic CT scan. On December 28, 2006, Ms. Williams' complaints of lower back and leg pain continued, with increased severity. Dr. Drerup diagnosed her as suffering from S1 radiculopathy on the right without evidence of structural pathology to account for her symptoms. He again noted that he had very little to offer Ms. Williams, other than a lumbar interbody fusion with pedicle screw instrumentation.

Ms. Williams was seen by Dr. Clark Gunderson, a Lake Charles, Louisiana orthopedic surgeon, on April 3, 2007. In his report, Dr. Gunderson noted that she had mild lumbar scoliosis, diminished strength in her right extensor hallicis longus muscle, diminished sensation at the L5-S1 dermatome, an absent right Achilles reflex, and a positive straight leg raise test on the right at forty degrees. She also exhibited tenderness at the right L5 region, as well as the right sacroiliac and sciatic notch regions. Dr. Gunderson opined that Ms. Williams was suffering from persistent radiculopathy and requested that she return with her actual MRI films. He felt that she might be a candidate for a repeat laminectomy with fusion with pedicle screw instrumentation. He further stated that he did not feel she was capable of working. In an April 17, 2007 fax transmission to Ms. Williams' attorney, Dr. Gunderson requested authorization for a transforaminal lumbar interbody fusion at L5-S1, with posterolateral fusion at L5-S1, with pedicle screws. By correspondence dated ten

days later, April 27, 2007, Tioga Manor refused authorization for this surgery, stating that it did not recognize Dr. Gunderson as Ms. Williams' treating physician because she had not requested permission to change her treating physician and because Dr. Drerup had never issued an opinion requesting an orthopedic referral. Tioga Manor refused payment of Dr. Gunderson's fees for service as well.

Rather than approve of Dr. Gunderson's surgical recommendation, Tioga Manor sent Ms. Williams to be examined by Dr. Allen S. Joseph, a Baton Rouge neurosurgeon. When Dr. Joseph examined Ms. Williams on June 19, 2007, he noted that she continued to suffer chronic back and right lower extremity pain, but found her neurologic examination to be somewhat inconsistent, with no objective findings. Dr. Joseph disagreed with Drs. Drerup's and Gunderson's recommendation for surgery. In his opinion, the proposed surgery was unproven in this situation and provided little likelihood for a meaningful and lasting benefit to Ms. Williams. Dr. Joseph was of the opinion that Ms. Williams was capable of performing work at a light, sedentary level, but recommended that she undergo a functional capacity examination to identify specific job restrictions commiserate with her physical capabilities.

Ms. Williams filed the instant claim against Tioga Manor alleging numerous issues in dispute: the extent and duration of disability; non-payment or incorrect payment of indemnity benefits; failure to provide authorization for medical treatment; non-payment and/or untimely payment of medical and travel related expenses; failure to furnish reports of treating physicians within thirty days; failure to provide vocational rehabilitation; wages; the arbitrary withholding of consent for recommended treatment; and penalties and attorney fees.

7

Following a two day trial, the WCJ rendered oral reasons which included numerous findings. The WCJ determined that Ms. Williams' compensation rate was $182.27 per week, based on an average weekly wage of $273.52 and $9.52 per week for fringe benefits; that she was not entitled to TTD benefits for the three days that she was unable to work in October 2004, and that Tioga Manor was entitled to a credit for all indemnity benefits previously paid; that Ms. Williams was not entitled to TTD benefits or supplemental earnings benefits (SEB) for February 4-22, 2005; and that she was entitled to reinstatement of her TTD benefits beginning on August 27, 2007. The WCJ awarded Ms. Williams SEB: $528.84 for July 24, 2006-August 23, 2006 (The Summit Retirement Center); $376.56 for August 2006, and $648.36 for November 2006 (Matthews Memorial Nursing Home); and $643.87 for April 2007 (Future Expectations Community Care). Ms. Williams was also awarded $111.20 as reimbursement for travel expenses.

The WCJ further held that Tioga Manor was arbitrary and capricious and awarded penalties in several instances: $2,000.00 for incorrect payment of indemnity benefits (failure to include fringe benefits); $2,000.00 for discontinuance of Dr. Smith's treatment and the refusal to pay Red River Pharmacy for medication he prescribed; $2,000.00 for refusal to authorize Dr. Gunderson's treatment; $2,000.00 for failure to pay for an emergency room visit to Rapides Regional Medical Center; and $850.00 for late payment of her indemnity benefits. The WCJ awarded Ms. Williams $2,000.00 for Tioga Manor's arbitrary and capricious August 6, 2006 termination of her indemnity benefits, based on Dr. Smith's July 19, 2006 release of Ms. Williams to sedentary work, and awarded her $6,500.00 in attorney fees.

8

Finally, the WCJ held that Ms. Williams was entitled to reasonable medical care, including treatment by Dr. Smith and Dr. Gunderson, and stated that their treatment, as well as the payments to Red River Pharmacy and Rapides Regional Medical Center, should be reimbursed pursuant to the fee schedule.

Ms. Williams has appealed this judgment raising three assignments of error:

1)      The facts surrounding plaintiff's inability to work from February 5-22, 2005 were not disputed. In its post-trial brief, defendant did not even contest plaintiff's entitlement to indemnity benefits for this period of time. Did the WCJ err, as a matter of law, in refusing to award indemnity benefits from February 5, 2005 through February 22, 2005?

2)      The WCJ correctly determined that defendant's termination of indemnity benefits on August 15, 2006 was arbitrary, as was defendant's discontinuance of Dr. Smith's treatment in September, 2005. In view of the rationale of this Court in *Mullins v. Concrete & Steele Erectors*, 06-510 (La.App. 3 Cir. 9/27/06); 940 So.2d 803, was the WCJ's award of only a $2,000.00 penalty in accord with 23:1201(I) for the discontinuance of indemnity benefits *and* Dr. Smith's treatment unreasonably low?

3)      After considering all relevant factors enunciated in *McCarroll v. Airport Shuttle, Inc.*, 2000-1123 (La. 11/28/00); 773 So.2d 694, and awards in similar cases, was the WCJ's attorney fee award of only $6,500.00 unreasonably low?

Tioga Manor answered Ms. Williams' appeal and alleged additional errors it claimed were committed by the WCJ:

1)      The trial court erred in the calculation of the average weekly wage on the grounds that the claimant was a full-time employee who regularly worked less than forty hours at her own discretion.

2)      The trial court erred in failing to recognize Appellee's credit for overpayment of indemnity benefits.

3)      The trial court erred in finding that the Appellant was entitled to indemnity benefits after August 5, 2006 through August 27, 2007.

9

4) The trial court erred in awarding the Appellant the medical expenses of Dr. Smith from August 19, 2005 through December 6, 2006.

5) The trial court erred in awarding the Appellant the medical expenses of Dr. Gunderson prior to the surgery.

6) The trial court erred in awarding the Appellant $8,000 in penalties pursuant to LSA-R.S. 23:1201(F) for the following:

   A. incorrect payment of indemnity benefits;

   B. failure to authorize and pay for treatment by Dr. Gunderson;

   C. failure to pay emergency room treatment at Rapides Regional Medical Center;

   D. failure to pay Red River Pharmacy medications and medical bills of Dr. Smith from August 19, 2005 through December 6, 2006;

   E. untimely payment of benefits for the weekly periods from July 2, 2006 through July 22, 2006.

7) The trial court erred in awarding the Appellant a $2,000 penalty pursuant to LSA-R.S. 23:1201(I) for the discontinuance of indemnity benefits on August 5, 2006.

8) The trial court erred in awarding the Appellant a $6,500 attorney fee pursuant to LSA-R.S. 23:1201(J).

**OPINION**

The standard of review applying in workers' compensation cases was set forth by the supreme court in *Dean v. Southmark Construction*, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117:

> In worker's [sic] compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC's findings of fact is the "manifest error-clearly wrong" standard. *Brown v. Coastal Construction & Engineering, Inc.*, 96-2705 (La.App. 1 Cir. 11/7/97), 704 So.2d 8, 10, (citing *Alexander v. Pellerin Marble & Granite*, 93-1698, pp. 5-6 (La.1/14/94), 630 So.2d 706, 710). Accordingly, the findings of the OWC will not be set aside by a reviewing court unless

they are found to be clearly wrong in light of the record viewed in its entirety. *Alexander*, 630 So.2d at 710. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Robinson v. North American Salt Co.*, 02-1869 (La.App. 1 Cir.[6/27/03]), 865 So.2d 98, 105. The court of appeal may not reverse the findings of the lower court even when convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Robinson*, 865 So.2d at 105.

Due to the number of issues raised by both parties, we will attempt to address them in an organized and sequential manner.

## *AVERAGE WEEKLY WAGE*

Tioga Manor argues that the WCJ erred in calculating Ms. Williams' average weekly wage based on a forty-hour work week when, by her own discretion, she worked an average of less than forty hours per week. It concedes, however, that she is entitled to fringe benefits of paid vacation and paid holidays and that this amount should have been included in calculating the average weekly wage.

Prior to her August 29, 2003 accident, Ms. Williams worked full-time as a certified nurse's aide for Tioga Manor. Her work schedule was not week-to-week, but she would work eight hours per day for four straight days, have two days off, and resume her four-day work schedule. She claims that based on this schedule, she was also entitled to accumulate forty hours of vacation time and forty hours for five paid holidays. On occasion, she worked overtime.

Donna Beaubouef, the administrator for Tioga Manor, testified that Ms. Williams was employed full time, at a rate of $6.60 per hour. According to Ms. Beaubouef, a full-time employee for Tioga Manor works 7.5 hours per day, 37.5 hours per week, and only obtains forty or more hours per week if he or she volunteers for an extra shift. Ms. Beaubouef also disagreed with Ms. Williams' calculation of

11

vacation and holiday time. According to Ms. Beaubouef, Ms. Williams' vacation and holiday pay was calculated on a 37.5-hour work week and not a forty-hour work week. Ms. Beaubouef testified that Ms. Williams had missed seven days of work in the four weeks immediately prior to the accident and that she provided a reason for only three of the four days she called in.

Lyman Phillips, a supervisor for Employers Risk, testified that following Ms. Williams' initial injury, Employers Risk determined her average weekly wage to be $190.58 based on the four full weeks prior to the accident, 37.5 hours of employment per week, and an hourly rate of $6.60. Based on this calculation, Tioga Manor set her initial weekly compensation rate at $127.50. According to Mr. Phillips, after the reinjury in February 2005, the Employers Risk adjustor requested additional wage records from Tioga Manor and, using those records, calculated the new weekly indemnity benefit at $180.00. Mr. Phillips asserted in his testimony that even using the additional records, this amount was $4.00 per week more than she was entitled to. In fact, he asserted that use of the new wage records was improper and should have only been used if Ms. Williams had suffered a new work-related injury. Thus, Mr. Phillips asserted, the new award should have been the same as the original, or $127.50 per week.

The WCJ held that Ms. Williams was entitled to the forty-hour presumption in calculating her average weekly wage. In reaching this conclusion, the WCJ relied on the fact that Tioga Manor failed to present evidence to show that the complained-of absences from work were unexcused.

Louisiana Revised Statutes 23:1021(12)(a) provides the calculation for determining the average weekly wage of an employee who is paid hourly:

12

(i)  If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater; or

(ii)  If the employee is paid on an hourly basis and the employee was offered employment for forty hours or more but regularly, and at his own discretion, works less than forty hours per week for whatever reason, then, the average of his total earnings per week for the four full weeks preceding the date of the accident; or

(iii)  If the employee is paid on an hourly basis and the employee is a part-time employee, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the injury.

In *Guillory v. Bofinger's Tree Service*, 06-86 (La.App. 1 Cir. 11/3/06), 950 So.2d 682, the first circuit held that where an injured worker fails to fit literally within any of the three categories listed in La.R.S. 23:1021(12), his or her wage should be determined by deciding which of the three categories best fit his or her situation.  We are faced with the same dilemma in the matter before us and find the first circuit's approach to be correct.

Ms. Williams is, by Tioga Manor's own description, a full-time employee. However, a full-time employee at Tioga Manor only works 37.5 hours per week and only works forty or more hours if he or she volunteers for overtime.  Subsection (iii) is not applicable because Tioga Manor hired Ms. Williams as a full-time employee; she was never classified as being part-time.  La.R.S. 23:1021(11).  Moreover, subsection "(ii)" does not fit because Ms. Williams did not regularly, and at her own discretion, refuse to work less than the 37.5 hours offered by Tioga Manor.  Thus, the description which bests fits Ms. Williams is that found in subsection "(i)."

In the four weeks prior to her accident, Ms. Williams worked 52.50 hours for the pay period ending August 9, 2003; she worked 63 hours for the pay period ending

August 23, 2003; and she worked 30.5 hours for August 24-29, 2003. In reviewing her prior work history, she consistently worked at least 75.5 hours every pay period: 74.75 hours for the period ending June 12, 2003; 81.75 hours for the period ending June 28, 2003; 8.50 hours for the period ending July 12, 2003; and 83.50 hours for the period ending July 26, 2003. Based on the work history in evidence, we cannot say that the WCJ erred in finding that Tioga Manor failed to rebut the presumption that Ms. Williams was entitled to forty hours in calculating her average weekly wage. Based on her wages of $264.00 and her fringe benefits of $4.76 for paid vacation and $4.76 for paid holidays, Ms. Williams' average weekly wage equals $273.52. Accordingly, we find no error in the WCJ's calculation of Ms. Williams' compensation rate of $182.36.

### INDEMNITY BENEFITS

### Ms. Williams

In her first assignment of error, Ms. Williams argues that the WCJ erred in finding that she was not entitled to indemnity benefits during February 5-22, 2005. Ms. Williams argues that the WCJ's error was an error of law, rather than an error of fact, as Tioga Manor failed to dispute this fact in its post-trial brief to the WCJ. However, Tioga Manor vehemently disputes that contention and explains its failure to address this issue in its post-trial brief on the actions of Ms. Williams' counsel in failing to fully disclose the trial issues in its pre-trial statement and its late filing of the same. Neither of these arguments changes the fact that entitlement of benefits is based on the determination of the underlying facts, and factual findings are reviewed on appeal pursuant to the standard of review set forth in *Dean*, 879 So.2d 112.

14

Ms. Williams testified that she was unable to perform the duties of a restorage aide between December 2003 and February 23, 2005, due to back and leg pain. She stated that in February 2005, she suffered a reoccurrence of this pain while helping a patient into the whirlpool. Her time card for February 4, 2005, reflects that she worked 4.9 hours that day, and she claims that she did not return to work before her initial visit to Dr. Smith's office on February 23, 2005.

Dr. Smith's records reveal that Ms. Williams was seen by his physician assistant on February 23, 2005, at which time she complained of pain in her lower back and in her right buttock and leg. Her working status that day was listed as "working," although she was restricted from working that day. His records also reflect that when she returned to him on February 25, 2005, she reported that she had not worked since her last visit and that her pain had decreased. He further restricted her from working at that time.

According to Mr. Phillips, Ms. Williams' file reflected that she began missing work on February 23, 2005, not February 4, 2005. However, he acknowledged that prior to February 23, 2005, her file had been closed. His reason for believing that she had worked between February 4 and February 23, was that on March 1, 2005, the adjustor working on the file requested that Tioga Manor provide him Ms. Williams' wage records for the four weeks preceding February 23, 2005. According to Mr. Phillips, if Ms. Williams' records had revealed that she last worked on February 4, 2005, the adjustor would have investigated and determined whether benefits were owed as of that date.

In his oral reasons, the WCJ stated that Dr. Smith thought that Ms. Williams was suffering from a recurrent disc herniation as of October 2004. He noted that her

symptoms had worsened by February 2005, and that she was restricted from working as of February 23, 2005. This was the date that Tioga Manor resumed her indemnity benefits. Based on Dr. Smith's records, the WCJ held that Ms. Williams failed to prove her entitlement to TTD benefits between February 4-22, 2005.[1]

Based on the evidence in the record, we find no error in the WCJ's judgment denying Ms. Williams TTD benefits during the weeks in question.

***Tioga Manor***

In its answer to appeal, Tioga Manor questions the WCJ's award of indemnity benefits to Ms. Williams during the period of August 5, 2006 through August 27, 2007. According to Mr. Phillips, Employers Risk terminated Ms. Williams' indemnity benefits based on two reasons: (1) Dr. Smith's July 18, 2006 release to work, and (2) because Ms. Williams applied for certified nurse's aide positions at The Summit Retirement Center and Lexington House Nursing Home, and was subsequently hired by both The Summit Retirement Center and Matthews Memorial Nursing Home. He suggested that the totality of this information indicated that Ms. Williams had been released to work, had applied for a certified nurse's aide position, and had been hired in that position. That being the case, the adjustor concluded that Ms. Williams was not entitled to SEB, and the WCJ erred in awarding benefits for that period.

With regard to Dr. Smith's release, the record establishes that on August 11, 2006, Ms. Williams received a letter from Employers Risk informing her of the immediate termination of her indemnity benefits as of August 5, 2006. Included in the letter was a copy of Dr. Smith's Work Status Report, dated July 18, 2006. This

---

[1]The WCJ used the date of February 4, 2005 in his oral reasons. However, Ms. Williams' employment records show that she worked a partial day on February 4, 2005.

16

report noted that Ms. Williams' work status was "Return without modifications," effective that day. However, further in the report, under "Other Modifications," Dr. Smith wrote, "Sedentary work as defined by US [Department of Labor]."

On the one hand, Tioga Manor claims that Dr. Smith's July 18, 2006 release was inconsistent, yet on the other, it claims that it relied partially on that release to terminate Ms. Williams' benefits on August 5, 2007. Dr. Smith testified that he did not think this made the report inconsistent. He stated that had he marked Ms. Williams' work status as modified, Tioga Manor would not have allowed her to return to work. By checking "return without modification," he said that in reality, Ms. Williams was released without modification, but for sedentary work only.

The record also establishes that on August 1, 2006, Ms. Williams was examined by Dr. Drerup. His progress report that day noted that Ms. Williams wished to return to work at sedentary duty, as a sitter, a position that required no lifting. Dr. Drerup approved her request and released her to return to work with activity to tolerance. A copy of this report was sent to Employers Risk.

The WCJ did not accept Tioga Manor's excuse that Dr. Smith's July 19, 2006 release was inconsistent—nor do we. If it was confused as to Dr. Smith's intent, Tioga Manor should have asked him for clarification—especially in view of Dr. Drerup's August 1, 2006 progress report. What is especially glaring about Tioga Manor's reliance on Dr. Smith's "inconsistent" release is the fact that it failed to recognize Dr. Smith as Ms. Williams' treating physician and refused to pay for any treatment recommended by him subsequent to August 18, 2005.

With regard to the second reason for termination of benefits, Mr. Phillips testified that Employers Risk's adjustor spoke to the administrators of The Summit

Retirement Center and Lexington House Nursing Home on July 26, 2006, and learned that Ms. Williams was seeking employment at those facilities as a certified nurse's aide. However, other than the basic inquiry by the adjustor, Mr. Phillips could not provide any more specific information concerning the adjustor's inquiry.

Ms. Williams testified that after Dr. Smith released her to sedentary work, Tioga Manor offered her a position as a certified nurse's aide, but not as a restorage aide, the position she was performing at the time of her reinjury. Because she could no longer perform the duties involved in the position offered at Tioga Manor, she applied for employment at The Summit Retirement Center. According to Ms. Williams, the position was titled certified nurse's aide, but her new employer was well aware of her condition and placed her with other employees, who performed her lifting. She ultimately left that position because she was to be moved into a situation where she would be required to lift her own patients, something she could not physically do. She began working with The Summit Retirement Center on July 24, 2006, and left that position on August 23, 2006. During her employment, she was paid $6.40 per hour.

She next worked for Matthews Memorial Nursing Home from August through November 2006. As was the case at The Summit Retirement Center, her employer was also aware of her condition and made accommodations. According to Ms. Williams, she left this position when Dr. Smith restricted her from working in November 2006. She stated that in late April 2007, she began employment as a sitter with Future Expectations Community Care Services, LLC, and remained employed there through July 2007. Her beginning pay was $6.65 per hour and she was making $7.00 per hour when she left that position.

18

The WCJ determined that Ms. Williams' average monthly wage prior to her injury was $1,185.25, and that ninety percent of that amount equaled $1,066.73. The WCJ then determined the monthly wages earned by Ms. Williams for each month between August 2006 and June 2007 and, after doing so, awarded SEB in the following amounts: $376.56 for August 2006; $648.36 for November 2006; and $643.87 for April 2007. The WCJ found that Ms. Williams was not entitled to an award of SEB for the months of September and October 2006, and May and June 2007, as her wages exceeded $1,066.73 for those months. The WCJ further held that she was entitled to SEB for the other time periods between July 24, 2007[2] through August 26, 2007, however, he could not make an award based on the incomplete records before him.

Pursuant to La.R.S. 23:1221(3), an injured employee who is unable to earn at least ninety percent of his pre-injury wages is entitled to SEB in the amount equal to sixty-six and two-thirds percent of the difference between his or her average monthly wage at the time of the injury and the average monthly wages earned thereafter. After reviewing Ms. Williams' payroll records for the months at issue in light of La.R.S. 23:1221(3),we find no error in the WCJ's determination that Ms. Williams was entitled to SEB benefits for the periods at issue.

Tioga Manor further argues that the WCJ erred in failing to recognize that it was entitled to a credit for the overpayment of indemnity benefits. This is based on its own determination that Ms. Williams' compensation rate is $133.34. However,

---

[2]The WCJ's oral reasons for judgment discuss the period of time between July 2007 through the date of Ms. Williams' surgery in late August 2007. The judgment lists the time period as being between July 24, 2006 through August 26, 2007. However, as SEB was already awarded for these months in 2006, July 24, 2006 was obviously an error and the correct year should have been 2007.

based on our prior affirmation of the WCJ's determination that Ms. Williams is entitled to $182.36 in weekly benefits, we find no merit in this issue.

***MEDICAL EXPENSES***

In its answer to appeal, Tioga Manor argues that the WCJ erred in awarding Ms. Williams Dr. Smith's medical expenses, for August 19, 2006 through December 6, 2006, and Dr. Gunderson's medical expenses, for treatment prior to her third surgery. Tioga Manor's grounds for refusing to authorize treatment by either doctor was the same: Ms. Williams' treating physician is Dr. Drerup, thus, she is not entitled to treatment from either Dr. Smith or Dr. Gunderson. We disagree.

Louisiana Revised Statutes 23:1121(B)(1) provides:

> The employee shall have the right to select one treating physician in any field or specialty. . . . After his initial choice the employee shall obtain prior consent from the employer or his workers' compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.

Mr. Phillips testified that after August 19, 2005, the adjustor handling Ms. Williams' claim refused authorization for all of Dr. Smith's recommendations and requests for payment, and notified Dr. Smith numerous times thereafter informing him that no authorizations or payments would be forthcoming until Dr. Drerup released Ms. Williams from his care. Mr. Phillips stated that this refusal was done in order to avoid a duplication of treatment.

Mr. Phillips further testified that Employers Risk refused authorization for Dr. Gunderson's request for surgery and payment for his treatment for basically the same reason. In an April 27, 2007 letter to Ms. Williams' counsel, Tioga Manor denied Dr. Gunderson's request on the grounds that Dr. Drerup, her treating physician, had not

20

referred her to Dr. Gunderson and because it did not recognize him as her treating physician since she failed to obtain prior approval for the change of doctors.

Dr. Smith, although a surgeon, specializes in occupational industrial medicine. Dr. Drerup is a neurosurgeon, and Dr. Gunderson is an orthopedic surgeon. Dr. Smith testified that his treatment focused on managing Ms. Williams' pain, whereas Dr. Drerup's treatment focused on the neurosurgical aspect. Numerous references are made by Dr. Drerup in his medical records pertaining to the coordination between him and Dr. Smith in Ms. Williams' treatment.

Pursuant to La.R.S. 23:1121(B)(1), Ms. Williams was entitled to seek treatment from all three physicians as they specialize in different fields. No prior approval by Tioga Manor was necessary. Furthermore, we note that this is not a new concept in workers' compensation law as this issue has been litigated numerous times. Thus, Tioga Manor has no excuse for refusing to allow Ms. Williams treatment by either Dr. Smith or Dr. Gunderson. Therefore, we find no error in the WCJ's judgment awarding Ms. Williams medical expenses for treatment by these doctors.

## PENALTIES

### La.R.S. 23:1201(I)

In her second assignment of error, Ms. Williams argues that the WCJ awarded an unreasonably low penalty when it awarded her only $2,000.00 in penalties for Tioga Manor's termination of her indemnity benefits and $2,000.00 for its discontinuance of Dr. Smith's treatment. However, Tioga Manor questions whether either award was warranted. We agree with Ms. Williams and increase the amount of penalties awarded to her.

21

The 2003 revision of La.R.S. 23:1201 enacted subsection (I), which provides for the imposition of penalties and attorney fees in the event an employer/insurer discontinues the payment of claims to an employee, when such discontinuance is found to be arbitrary, capricious, and without probable cause. The statute further sets a cap on the penalties awarded under this subsection at $8,000.00.

"In determining whether an employer's actions are arbitrary and capricious, the crucial inquiry is whether the employer can articulate an objective reason for terminating benefits at the time of the termination." *Doyal v. Vernon Parish Sch. Bd.*, 06-1088, p. 10 (La.App. 3 Cir. 2/7/07), 950 So.2d 902, 909, *writ denied*, 07-832 (La. 6/15/07), 958 So.2d 1190. Whether an employer is arbitrary and capricious is a finding of fact, which is reviewed pursuant to the manifest error standard of review. *Id*. However, the WCJ's award of penalties and attorney fees, that is the actual amount awarded, is entitled to great discretion and will not be disturbed absent an abuse of that discretion. *Int'l. Maint. Corp. v. Stoddard*, 05-676 (La.App. 3 Cir. 12/30/05), 918 So.2d 1077.

In this instance, Tioga Manor discontinued Ms. Williams' weekly indemnity benefits on August 5, 2006. It also discontinued authorization for all treatment by Dr. Smith subsequent to August 19, 2005. The WCJ held that these actions were arbitrary and capricious and without probable cause and awarded a $2,000.00 penalty in each instance. We find no error in the WCJ's findings with regard to the discontinuance. However, we do find that his award of $2,000.00 for each discontinuance was abusively low. We now award $4,000.00 for each violation, for a total penalty of $8,000.00 pursuant to La.R.S. 23:1201(I), in line with the $8,000.00 cap provided therein.

22

*La.R.S. 23:1201(F) Penalties*

In its answer to appeal, Tioga Manor argues that the WCJ erred in awarding $8,000.00 in penalties for the following infractions: (A) the incorrect payment of indemnity benefits; (B) the failure to authorize and pay for treatment by Dr. Gunderson; (C) the failure to pay emergency room treatment at Rapides Regional Medical Center; (D) the failure to pay Red River Pharmacy medications and medical bills of Dr. Smith from August 19, 2005 through December 6, 2006; and (E) the untimely payment of benefits for the weekly periods from July 2, 2006 through July 22, 2006.[3]

Louisiana Revised Statutes 23:1201(F), as revised, provides for the imposition of penalties and attorney fees if the employer fails to provide payment of compensation or medical benefits or fails to approve the employee's request to select a treating physician or change of physician, if approval is required. The statute limits the amount of each penalty to $2,000.00. Although the statute does not limit the actual number of penalties which may be imposed, it caps the total amount which may be awarded based on those penalties at $8,000.00. However, no penalties and attorney fees will be assessed if the employer has reasonably controverted the employee's claim or if the nonpayment resulted from a condition which was beyond the employer's control. La.R.S. 23:1201(F)(2).

"In order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits." *Guillory*, 950 So.2d

---

[3]The WCJ, in his oral reasons, awarded penalties of $2,000.00 for the incorrect payment of benefits; $2,000.00 for the failure to pay Dr. Gunderson; $2,000.00 for the failure to pay Rapides General Medical Center; $2,000.00 for the combined discontinuance of Dr. Smith's treatment and the failure to pay Red River Pharmacy; and $850.00 for the late payment of benefits. This amounts to $8,850.00 in penalties. However, the actual $8,000.00 awarded in penalties in the WCJ's judgment accords with the cap set out in La.R.S. 23:1201(F).

23

at 692. However, an employer will not escape punishment via the imposition of penalties and attorney fees by alleging its own clerical error. *Ducote v. La. Indus., Inc.*, 07-1536 (La.App. 3 Cir. 4/2/08), 980 So.2d 843.

At the outset, we note that Tioga Manor has failed to present any argument regarding the WCJ's award of penalties based on its untimely payment of benefits for the period of July 2, 2006 through July 22, 2006. Therefore, we will consider this claim as being abandoned. Uniform Rules—Courts of Appeal, Rules 2-12.4 and 2-12.5; *Tillery v. State, Dep't of Pub. Safety and Corrs.*, 07-1228 (La.App. 1 Cir. 2/8/08), 984 So.2d 742.

*A. Underpayment of Benefits*

In his oral reasons, the WCJ awarded Ms. Williams $2,000.00 in penalties based on Tioga Manor's miscalculation of her TTD indemnity benefits. In our prior calculation, we affirmed the WCJ's determination of Ms. Williams' weekly compensation rate of $182.36. Initially, Tioga Manor paid weekly compensation to Ms. Williams in the amount of $127.05. This payment continued until December 13, 2004, when Ms. Williams returned to work. Thereafter, on February 23, 2005, Tioga Manor reinstated Ms. Williams' indemnity benefits in the amount of $180.00 per week, and it continued payment at this rate until her benefits were terminated on August 5, 2006.

The WCJ found that the miscalculation was due to Tioga Manor's own clerical error. We agree. Although Tioga Manor increased the amount of weekly indemnity benefits in February 2006, its figure was still incorrect as it gave no consideration to the fact that Ms. Williams was receiving paid vacation and paid holidays as part of

24

her wages. Tioga Manor concedes that she was receiving these fringe benefits. Accordingly, the WCJ's award of $2,000.00 in penalties is affirmed.

**B.  *Failure to Pay Medical Expenses***

Tioga Manor next questions the WCJ's award of penalties with regard to its failure to pay the following medical expenses:  Dr. Gunderson's treatment, Rapides Regional Medical Center emergency room bill, and the Red River Pharmacy bill and Dr. Smith's treatment.  We need not address the award pertaining to Dr. Smith's treatment as that was addressed in the section of our opinion concerning the La.R.S. 23:1201(I) damages award.

With regard to the issue relating to Dr. Gunderson's treatment, we have already affirmed the WCJ's finding that Ms. Williams was entitled to select and receive treatment from Dr. Gunderson, an orthopedic surgeon.  Accordingly, it was reasonable for the WCJ to find that Tioga Manor had no valid reason for denying his treatment.  The decision to award Ms. Williams $2,000.00 in penalties based on this denial is affirmed.

We further find no error in the WCJ's award of penalties based on Tioga Manor's refusal to pay the medical bills presented by Rapides Regional Medical Center and the Red River Pharmacy.  The Rapides Regional Medical Center bill pertained to an emergency room visit by Ms. Williams on November 30, 2005.  Tioga Manor refused payment of this bill on January 5, 2006, based on the fact that Ms. Williams failed to obtain prior approval for this emergency room visit and because she already had a treating physician, Dr. Drerup.  The bill was eventually paid in March 2006.  The Red River Pharmacy bill pertained to medication prescribed by Dr. Smith to Ms. Williams as part of his treatment.  As Tioga Manor declined to authorize

Dr. Smith's treatment, it likewise refused to pay for medication prescribed by him after August 19, 2005.

Tioga Manor has a duty to furnish all reasonable and necessary medical care to Ms. Williams for her work-related injury. La.R.S. 23:1203(A); *Wilczewski v. Brookshire Grocery Store*, 08-718 (La.App. 3 Cir. 1/28/09), 2 So.3d 1214, *writ denied*, 09-456 (La. 4/13/09), 5 So.3d 170. This includes a trip to the emergency room by Ms. Williams after normal business hours for the treatment of her severe back pain. Moreover, as we have affirmed the WCJ's finding that Tioga Manor was arbitrary and capricious in discontinuing Dr. Smith's treatment, we also find that it was arbitrary and capricious for refusing to pay Red River Pharmacy for the medication he prescribed. Accordingly, we find no error in the WCJ's award of $2,000.00 for each of Tioga Manor's actions.

### *Attorney Fees*

In her third assignment of error, Ms. Williams argues that the trial court erred in awarding her only $6,500.00 in attorney fees. She argues that in light of the list of factors to be considered in fixing attorney fees set out by the supreme court in *McCarroll v. Airport Shuttle, Inc.*, 00-1123 (La. 11/28/00), 773 So.2d 694, and in consideration of attorney fee awards made in other cases, a more fitting award would have been $25,000.00. Tioga Manor argues that the $6,500.00 award was justified and should not be disturbed.

Louisiana Revised Statutes 23:1201(F) and (I) both allow for the award of reasonable attorney fees in the event penalties are assessed under these two subsections. However, La.R.S. 23:1201(J) limits the attorney fees awarded pursuant to this statute to "one reasonable attorney fee." The reasonableness of an attorney fee

26

award is based on "the degree of skill and ability exercised, the amount of the claim, the amount recovered for the plaintiff, and the amount of time devoted to the case." *Naquin v. Uniroyal Inc.*, 405 So.2d 525, 528 (La.1981); *see also Cormier v. State, Dep't of Wildlife and Fisheries*, 07-642, pp. 26-27 (La.App. 3 Cir. 11/21/07), 970 So.2d 1216, 1232, *writ denied*, 07-2466 (La. 2/15/08), 976 So.2d 186 (quoting *Lambert v. Brookshire Grocery Co.*, 06-1001, pp. 21-22 (La.App. 3 Cir. 12/20/06), 945 So.2d 918, 933).

In awarding the $6,500.00 in attorney fees, the WCJ issued the following oral reasons:

> Considering the success Mr. Flournoy has had on behalf of Ms. Williams in recovering SEB benefits for and having her average weekly wage properly calculated and obtaining for her penalties in association with the failure to correctly pay her compensation rate for the deprival of her medical care with Dr. Smith, and although this trial proceeded over a course of three days, this was certainly not a trial necessitating three days to be tried, and Mr. Flournoy argues for himself that he should be entitled to a Twenty-Five Thousand Dollar ($25,000.00) attorney fee as this Court awarded such a sum in the matter of <u>Doyle versus Vernon Parish School Board</u>, 958 So.2d 1190, with regard to a three-day trial. That was a very complicated trial, very difficult issues, nothing protracted about the trial due to complications from failure to provide Pretrial Statement, et cetera, or clearly defined issues. Everything was clearly defined in the <u>Doyle</u>. Everybody knew what was happening and the representation was excellent in that case.
>
> That's not to say that Mr. Flournoy did not do a good job for Ms. Williams in this case. It is simply to say that this Court does not believe that an attorney fee award of Twenty-Five Thousand Dollars ($25,000.00) is appropriate. The Court does award an attorney fee of Six Thousand Five Hundred Dollars ($6,500.00) which I feel is on the high end of being appropriate since the issues are well settled in a workers' compensation law. Nothing difficult about them, although some similarly presented in some type of convoluted fashion requiring a three-day trial.

While taking into consideration the above, we point out that counsel for Ms. Williams was able to correct Ms. Williams' average weekly wages, reinstate her TTD

benefits, obtain SEB on her behalf, and gain approval for treatment by Drs. Smith and Gunderson. The WCJ also awarded her $10,000.00 in penalties based on numerous violations by Tioga Manor of La.R.S. 23:1201(F) and (I). These include the termination, under-payment, and late payment of indemnity benefits, the discontinuance of Dr. Smith's treatment, the refusal to authorize and pay for Dr. Gunderson's treatment, the failure to pay mileage, and the failure to pay for reasonable and necessary medical expenses (Rapides Regional Medical Center and Red River Pharmacy). On appeal, we have increased two of the penalties awarded from $2,000.00 each to $4,000.00 each, for a total of $16,000.00 in penalties.

It is apparent from this result that counsel for Ms. Williams did exert a degree of skill and ability in the furtherance of his representation and that he obtained a very favorable result on her behalf. Although the WCJ stated, and Tioga Manor argues on appeal, that the issues in this matter were not complicated and that the trial's two-day length was a direct result of counsel for Ms. Williams's failure to timely file and clarify the trial issues, the results in this instance speak for themselves. Furthermore, the WCJ's oral reasons for judgment covered approximately seventeen legal-sized pages. Obviously, numerous issues were raised and addressed and the length of trial cannot totally be blamed on Ms. Williams' counsel.

Considering the foregoing, we find that the WCJ's award of $6,500.00 in attorney fees is abusively low, and we raise that to a more appropriate amount of $15,000.00.

## DISPOSITION

Based upon the foregoing reasons, we amend the WCJ's judgment to increase from $2,000.00 to $4,000.00 the penalty for Tioga Manor's termination of Ms.

28

Williams' indemnity benefits and increase from $2,000.00 to $4,000.00 the penalty for its discontinuance of Dr. Smith's treatment. We further amend the WCJ's judgment to increase the award of attorney fees from $6,500.00 to $15,000.00. The judgment of the WCJ is affirmed in all other respects. The costs of this appeal are assessed to the defendant, Tioga Manor Nursing Home.

**AFFIRMED AS AMENDED.**