# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-1264

CATHY TURNER

VERSUS

LEXINGTON HOUSE

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 2
PARISH OF RAPIDES, NO. 13-03972
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and John E. Conery, Judges.

**AFFIRMED.**

George Arthur Flournoy
Flournoy & Doggett (APLC)
P. O. Box 1270
Alexandria, LA 71309-1270
Telephone: (318) 487-9858
COUNSEL FOR:
    Plaintiff/Appellee - Cathy Turner

Morgan E. Levy
Gugielmo, Marks, Schutte, Terhoeve & Love
320 Somerulos Street
Baton Rouge, LA 70802-6129
Telephone: (225) 387-6966
COUNSEL FOR:
    Defendant/Appellant - Lexington House

**THIBODEAUX, Chief Judge.**

The defendant employer, Lexington House LLC, d/b/a Lexington House (Lexington), appeals from a judgment of the Office of Workers' Compensation (OWC) awarding benefits, penalties, and attorney fees to the employee, Cathy Turner. Finding no error or manifest error on the part of the OWC, we affirm the judgment in all respects.

## I.

## ISSUES

We must decide:

(1) whether the trial court manifestly erred in awarding the employee temporary total disability benefits;

(2) whether the trial court erred in calculating the employee's average weekly wage;

(3) whether the trial court manifestly erred in ordering the employer to pay for reconstructive surgery;

(4) whether the trial court manifestly erred in ordering the employer to pay for anti-depressant medication;

(5) whether the trial court manifestly erred in penalizing the employer for: arbitrary termination of benefits; payment of benefits at the wrong rate; failure to authorize a functional capacity examination; failure to authorize reconstructive plastic surgery; failure to authorize payment of medication; and

(6) whether the employee's attorney fees should be increased for her attorney's work on appeal.

## FACTS AND PROCEDURAL HISTORY

Ms. Turner, a licensed practical nurse (LPN) in her forties, was recruited and hired by Lexington House in September 2010 for the position of Admissions Coordinator at their six-wing nursing home in Alexandria. Ms. Turner generated admissions for the facility through off-site interviews with potential patients, their families, their doctors, and their current facility personnel. She received bonuses based upon her admissions.

On December 12, 2011, Ms. Turner was standing at the nurse's station at Lexington House when a co-worker exited the area causing the swinging door to slam into Ms. Turner's left hip at the incision site of a recent total hip replacement (THR) surgery. The incision from the September 2011 surgery started at the lateral, or outside, part of her hip and extended up onto the left buttock. The impact was painful, causing her eyes to water, and it immediately produced redness and an "8cm x 8cm circular" bruise to Ms. Turner's left hip. The pain and swelling continued, and Ms. Turner developed an increased gait problem which aggravated chronic back problems. She was taken off work by her orthopedic surgeon and ultimately underwent an exploratory surgery to ascertain the status of the artificial hip. The joint was found to be intact, but permanent stitches from the prior surgery found under the incision required removal. Ms. Turner began physical therapy.

In June 2012, Ms. Turner's prognosis was to return to work in one month on light duty, secondary to fatigue. However, she fell twice at home and was not able to return. At the end of June, she had a marked increase of pain along the lateral aspect of the hip and buttock, point tenderness along the incision,

continued limping, and altered sensation in the left lateral leg and foot. Further testing was requested. In November 2012, Ms. Turner's surgeon opined that her pain and gait problems were caused by the accident and were aggravating pre-existing conditions. Ms. Turner also developed a deformity caused by the surgical incision sinking in, muscle wasting, and the accumulation of atrophied fat.

In January 2013, Lexington sent a list of random duties to Ms. Turner's surgeon, and to the physician that Lexington had selected for a second medical opinion (SMO). Both physicians checked off tasks while at the same time both recommended a functional capacity examination (FCE). The surgeon wanted an impairment rating, and the SMO conditioned its responses on the provision by Lexington of a motorized scooter or chair.

In late April 2013, Lexington sent a job description to Ms. Turner's surgeon seeking his approval of a nurse aid training instructor position for Ms. Turner. The surgeon initially approved the job description but withdrew his approval by letter on May 8, 2013, after talking to Ms. Turner. On May 11, 2013, Lexington terminated Ms. Turner's indemnity benefits.

Ms. Turner filed a workers' compensation claim 1008. Numerous issues were tried, including the denial or late approval of various tests and the concomitant penalties, which were decided in favor of Lexington. However, Ms. Turner's benefits were reinstated, and other issues were decided in her favor.

Lexington filed this appeal assigning nine errors in the OWC judgment and seeking to reverse: the award of temporary total disability benefits; the calculation of average weekly wage; the award for reconstructive surgery; the award for certain medication; and the award of five penalties associated with the termination of benefits and the failure to authorize benefits.

3

Ms. Turner answered the appeal, seeking an increase in the wage benefit and additional attorney fees for the work done on appeal.

## III.

## STANDARD OF REVIEW

Factual findings in workers' compensation cases are subject to the manifest error/clearly wrong standard of review. *Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So.2d 551. In applying this standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether its conclusion was reasonable. *Id.*

## IV.

## LAW AND DISCUSSION

Lexington contends that the OWC erred in awarding benefits to Ms. Turner, asserting that she failed to prove that she was disabled and entitled to temporary total disability (TTD) benefits under La.R.S. 23:1221(1) [1] or supplemental earnings benefits (SEB) under La.R.S. 23:1221(3). [2] In the alternative, Lexington argues that the award should have been for SEB only. We

---

[1]For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment[.]

La.R.S. 23:1221(1)(c) (in pertinent part).

[2]For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits, payable monthly, equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment[.]

La.R.S. 23:1221(3)(a)(i) (in pertinent part).

4

note at the outset that Lexington has not previously addressed SEB prior to this appeal, and that the termination of benefits dealt with by the OWC was Lexington's termination of TTD benefits with no attempt, unilateral or otherwise, to reduce the TTD benefits to SEB.

The workers' compensation judge (WCJ) reinstated Ms. Turner's TTD benefits after determining that her ongoing pain and problems with her hip, her leg, and her increased back pain due to her altered gait, were causally related to the work accident on December 12, 2011. He found that, while she had preexisting conditions, she was working and not disabled before the accident, and the accident was a factor in bringing about her disability. The record and the law support this determination.

> Because an employer takes his employee as he finds him, a preexisting condition does not prevent recovery through workers' compensation. *Curtis v. Wet Solutions, Inc.*, 98-789 (La.App. 3 Cir. 12/9/98); 722 So.2d 421. Aggravation of a preexisting injury may constitute a disabling injury when, for example, the plaintiff begins to suffer new symptoms after the second workplace accident. *Howell v. Service Merchandise Co., Inc.*, 95-79 (La.App. 3 Cir. 8/9/95); 663 So.2d 96. To be compensable, the aggravation of a preexisting injury must result from an identifiable and discernable incident. *City of Eunice v. Credeur*, 99-302 (La.App. 3 Cir. 10/13/99); 746 So.2d 146, *writ granted in part, judgment vacated in part*, 99-3249 (La. 1/28/00); 753 So.2d 226. Moreover, there must be a causal link between the aggravation and a work related incident. As we have recently explained,

>> [a] pre-existing disease or infirmity does not disqualify the claimant from receiving benefits if the workplace accident aggravated, accelerated, or combined with the disease to produce the disability for which compensation is claimed. Thus, the element of causation is satisfied if the employee's work-related accident was a *factor* in bringing about the employee's disabled status. Whether a causal relationship exists between the disability and the employment is a question of fact. The hearing officer's determination in this regard cannot be reversed unless it is manifestly erroneous based on examination of the record as a whole.

> The employee's workplace accident is presumed to have caused or aggravated her disability when she proves that: (1) before the accident, she had not manifested disabling symptoms; (2) commencing with the accident, the disabling symptoms appeared; and (3) there is medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and activation of the disabling condition. Once an employee establishes the presumption of a causal relationship, the employer must produce evidence and persuade the trier of fact that it is more probable than not that the injury was not caused by the work accident.

> *Rideaux v. Franklin Nursing Home*, 95-240, p. 5 (La.App. 3 Cir. 11/22/95); 664 So.2d 750, 755, *writ denied*, 95-3093 (La. 2/16/96); 667 So.2d 1058 (citations omitted).

*Tate v. Cabot Corp.*, 01-1652, pp. 5-6 (La.App. 3 Cir. 7/3/02), 824 So.2d 456, 461, *writ denied*, 02-2150 (La. 11/22/02), 829 So.2d 1044 (alteration in original); *See Rivers v. Bo Ezernack Hauling Contractor, Inc.*, 09-991 (La.App. 3 Cir. 3/10/10), 32 So.3d 1091.

Dr. Gordon Webb, Lexington's occupational medicine physician, saw Ms. Turner on December 16, 2011, four days after the accident on December 12. He reported a history of congenital hip dysplasia and the hip replacement in September 2011. Ms. Turner described the swinging door slamming into her left hip and upper thigh over the incision, creating a loud thump and pain which brought her to her knees. She reported that her hip hurt when she flexed it; that the pain had not improved since the injury; that her gait was off; and that she was limping so that now her back was hurting. She also reported a history of chronic back pain, stress, and depression. Dr. Webb diagnosed contusion, bruising, and swelling of the vastus lateralis muscle on the anterolateral proximal left thigh.

Dr. Steven Atchison, Ms. Turner's orthopedic surgeon in Shreveport, testified by deposition regarding Ms. Turner's three pre-injury hip surgeries and

what effect the work-injury and the fourth surgery had on her condition. When he saw Ms. Turner on December 6, 2011, before the work accident on December 12, she had some pain and discomfort at the lower portion of the incision, but she reported that she was doing "great." Dr. Atchison saw her post-injury on December 28, 2011. At that time, over two weeks after the accident, she had increased pain from the incident and still had swelling along the incision. There was still some swelling when he saw her on January 17, 2012. On January 31, 2012, he thought the soft tissue pain was related to the separation of the IT band and the gluteus maximus as a result of the blunt trauma, and he recommended exploratory surgery, which was approved in March 2012.

Lexington's attorney asked whether, standing alone, the more serious second and third pre-injury surgeries—the bi-polar hip in 2008, and the total hip replacement in 2011—would have caused Ms. Turner "a significant impediment in her everyday activities." Dr. Atchison answered negatively. He explained that the total hip replacements were hugely successful, with a 95% survival rate for lasting the patients fifteen to twenty years. He said the surgery "actually fixes their gait problem or the inability to work and function in society after that." When asked how much of Ms. Turner's overall disability, inability, pain, atrophy, dysfunction, and limping, were related to the injury and the fourth surgery, as opposed to her three preexisting hip surgeries, Dr. Atchison said he could not separate them or assign percentages to the causes. But, he clearly indicated that all of the events were contributing factors in "all these issues that ruined her life." He stated that the door incident did not alone cause all of her problems, but it led to a fourth surgery which was another insult to the fat and the skin. Dr. Atchison stated that there was no doubt that Ms. Turner's condition worsened after the swinging door

7

incident and the fourth surgery, including the muscle shrinking, the atrophy of the subcutaneous tissue or fat, the incisional pain, and the need for plastic surgery.

Dr. Carl Goodman, selected by Lexington for an SMO, examined Ms. Turner on January 24, 2013. Under the heading of "Assessment/Plan," Dr. Goodman assessed her back problems as disc degeneration. He then found: left hip complaints are her problem and have not resolved—probable soft tissue injury and at MMI; cause is job injury; no further RX or MRI advised; cannot stand or walk any distance or for over two hours due to pain; FCE is advised. On the same date, Dr. Goodman checked off certain light-duty tasks on a two-page list of random duties. At the bottom of each page, Dr. Goodman wrote that Ms. Turner will need a motorized scooter or chair to do the above; at the bottom of the second page he added above his initials, "Really need FCE."

Dr. Michael Dole, specializing in physical medicine/rehabilitation and pain management, testified by deposition that he treated Ms. Turner for left hip and left leg pain and depression secondary to chronic pain. His opinion in April 2013 was that Ms. Turner was "fully and totally disabled from the hip pain." In October 2013, Dr. Dole opined that the denial of necessary medical treatment for the left hip had caused progressive atrophy and deformity that, without treatment, would likely lead to permanent disfigurement and significant loss of function. He further indicated that Ms. Turner was not at MMI and was unable to return to work. He recommended that she see Dr. Quillin to "help manage depression due to work-related injury." Dr. Dole opined that Ms. Turner had preexisting depression worsened by the stressors of losing her job and her loss of function. He was hopeful that the plastic surgery would help her return to work at some point in the future. As of the February 2014 deposition, his opinion had not changed.

On cross-examination, Dr. Dole confirmed that he had found Ms. Turner disabled under social security guidelines in 2010 and had encouraged her to apply for disability benefits.[3] In August 2012, nine months after the subject accident, he again discussed disability with her; and in April 2013, he supplied supporting documentation for her. In July 2013, Ms. Turner was awarded Social Security Disability Benefits. Based upon the medical evidence and the testimony at trial, the OWC reinstated Ms. Turner's TTD benefits.

On appeal, Lexington argues that Ms. Turner should have been awarded SEB at most because Dr. Goodman and Dr. Atchison signed off on the task list in January 2013, and Dr. Atchison signed off on the nurse aid training instructor position in April 2013. However, the record reveals that Dr. Atchison retracted his approval of the instructor position on May 8, 2013, and both physicians recommended an FCE earlier in January 2013 which was never performed. The FCE is used to determine whether the employee is capable of performing a sedentary level job. *See Richard v. Calcasieu Parish Sch. Bd.*, 11-469 (La.App. 3 Cir. 12/28/11), 125 So.3d 1113. Once the extent of the employee's disability is determined, and it is established that she can do a certain level of work, it is then appropriate to convert TTD benefits to SEB, even though the employee is not working and the SEB payments are based upon zero earning

---

[3]During the cross-examination of Dr. Dole, Lexington's attorney sought to obtain Dr. Dole's opinion about events outside Dr. Dole's records. In so doing, he repeatedly supplied Dr. Dole with inaccurate dates, confused Dr. Dole, and at times created a flawed sequence of events. Based upon the record, Ms. Turner filed an application for social security disability benefits in 2010, but dropped the claim apparently when hired by Lexington in September 2010. After a year of what appears to have been aggressive and physically active work, Ms. Turner had a total hip replacement on September 28, 2011. She returned to work November 14, 2011 and worked modified hours for four (4) weeks, until the accident on December 12, 2011. She received workers' compensation benefits until they were terminated in May 2013. On July 3, 2013, Ms. Turner was found disabled and was awarded social security disability benefits as of the date of the subject accident, offset by workers' compensation benefits and to be reviewed in twenty-four months.

capacity. *See Id.* Here, Ms. Turner is still under regular treatment by physicians. No reasonably reliable determination of the extent of her disability has been made because the recommendations of Dr. Atchison and Dr. Goodman regarding the FCE were ignored by the employer.

In the WCJ's reasons for judgment, he mentioned that the nurse aid training instructor position was not actually in existence at Lexington at the time it was offered. Lexington argues that the burden had not shifted to it to prove availability under *Poissenot v. St. Bernard Parish Sheriff's Office*, 09-2793 (La. 1/9/11), 56 So.3d 170, because Ms. Turner had not proved that she was unable to earn 90% of her pre-accident wages. We addressed *Poissenot* and the shifting of the burden in *Richard,* 125 So.3d 1113, and found that the conversion to SEB was appropriate in *Richard* because an FCE had indicated that the claimant was capable of performing sedentary work. There, the SEB was awarded at zero earning capacity, and the burden shifted next to the employer to prove job availability at a certain pay level. In *Poissenot*, also, an FCE had been performed.

We have an entirely different set of facts in this case. No FCE was provided, and it appears that converting benefits to SEB was never even considered by Lexington before this appeal. They simply terminated Ms. Turner's TTD benefits after Dr. Atchison retracted his approval of the nurse aid training instructor's position. The WCJ was very clear that he placed "great significance in the testimony of Ms. Turner" who said she had taught the course at her previous employment and at Delta College, and it required much more than the "occasional" walking, stooping, and bending indicated by Lexington in the job description. The WCJ also found that the evidence warranted further surgery. We find that the

10

WCJ's determinations were reasonable and supported by the record. We affirm the reinstatement of the TTD benefits.

*Calculation of Average Weekly Wage*

At the time of the December 12, 2011 injury, Lexington was paying Ms. Turner $21.00 per hour as a full-time admissions coordinator. Giving her the presumption of the forty-hour work-week in La.R.S. 23:1021(13)(a)(i), the WCJ calculated her average weekly wage (AWW) at $840.00 and awarded her TTD benefits at $560.00 per week ($21 x 40 x .666). Lexington contends that this was error. It asserts that her wage should have been calculated on the actual hours worked in the four weeks preceding the accident, pursuant to La.R.S. 23:1021(13)(a)(ii), rather than the presumed forty-hour week of La.R.S. 23:1021(13)(a)(i).[4] We disagree. Ms. Turner's hip replacement was on September 28, 2011. She took unpaid leave and returned to work on November 14 and was working reduced hours post-surgery when the accident occurred on December 12. Referring to the record and the exhibits in the record, Lexington states in its own brief to this court: "Prior to Turner's FMLA leave following her hip replacement surgery, she was regularly offered and worked 40 hours per week." Lexington's brief further states that it agreed to reduce her hours after her hip surgery. Thus,

---

[4]Under La.R.S. 23:1021(13)(a), the AWW of employees paid by the hour is determined as follows:

(i) If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater; or

(ii) If the employee is paid on an hourly basis and the employee was offered employment for forty hours or more but regularly, and at his own discretion, works less than forty hours per week for whatever reason, then, the average of his total earnings per week for the four full weeks preceding the date of the accident[.]

Lexington had given its permission to the shorter hours worked by Ms. Turner for the four weeks between her return to work on November 14 and the accident on December 12, 2011.

Further, Ms. Turner's payroll records for 2011 indicate that, in addition to her "regular" pay hours, she received 48 hours of holiday pay, 46 hours of overtime pay, 40 hours of vacation pay, 8 hours of jury duty pay, 5.10 hours of in-service pay, and 7.7 hours of worked-holiday pay. She also received $1,047.45 in bonuses for the year, though $500.00 of that amount was not paid until February 2012. While the twenty-four days for post-surgery recovery that she took under the FMLA were uncompensated, Lexington still allotted eight hours each day for the leave. Accordingly, the records support the conclusion that Ms. Turner was a full time employee with benefits who was temporarily working shorter hours before the accident.

In *Hargrave v. State, DOTD*, 10-1044 (La. 1/19/11), 54 So.3d 1102, the claimant took annual and sick leave and was actually not present for forty hours of the four full weeks preceding his accident. The court determined that:

> La.R.S. 23:1021(12)(a)(i) provides the average weekly wage is calculated based on the "average actual hours worked in the four full weeks preceding the date of the accident **or forty hours, whichever is greater**" [emphasis added]. In using this language, the legislature indicated its intent to base the calculation of an employee's average weekly wage on the employee's ordinary earning capacity, not actual hours being worked at the time of the injury. *See* MALONE & JOHNSON, 14 LOUISIANA CIVIL LAW TREATISE: WORKERS' COMPENSATION LAW AND PRACTICE § 322, p. 82 (2002 ed.).

*Hargrave*, 54 So.3d at 1107.

12

The *Hargrave* court found that because the claimant generally worked a *normal forty-hour week*, there was no need to look to the actual hours worked.

We affirm the OWC's finding that Ms. Turner was entitled to the presumption of the forty-hour week under *Hargrave* and La.R.S. 23:1021(13)(a)(i).

Ms. Turner has answered the appeal, asserting that her AWW calculation should have included $742.00 in pre-injury, taxable fringe benefits that she received, thus, increasing her AWW calculation from $840.00 to $854.27 (($21 x 40 hours) + ($742.00 ÷ 52 weeks)) before computing the .666% indemnity benefit. The $742.00 represents four paid holidays and one day of in-service pay as discussed above. However, while Ms. Turner's figures are correct, *Hargrave* does not support the *addition* of holiday pay which is considered *as already included* in the wage calculation under the forty-hour presumption of La.R.S. 23:1021(13)(a)(i). Accordingly, we affirm the OWC's calculation of the total AWW pursuant to *Hargrave* and La.R.S. 23:1021(13)(a)(i).

### *Reconstructive Surgery*

Ostensibly quoting "La.R.S. 23:1221(p)," Lexington contends that the OWC erred in ordering it to pay for reconstructive plastic surgery on Ms. Turner's hip due to the fat necrosis at the incision site. It argues that in "not a single reported case" has a court granted "cosmetic surgery to correct disfigurement of the hip or buttocks" area. The implication of this sentence placed immediately below the quoted material is that the surgery is cosmetic only and is not compensable because it does not involve disfigurement of Ms. Turner's face or head. We disagree. As a threshold matter, Lexington improperly cites the statute and then egregiously misquotes it, quoting subparagraph (p) as it existed over

thirty years ago, prior to its amendment in 1983. The proper citation is La.R.S. 23:1221(**4**)(p).[5]

Paragraph (4) pertains to "permanent partial disability," not TTD, and to compensation "solely for anatomical loss of use or amputation." Subparagraphs (a) through (o) refer to loss of "members" such as hands, feet, etcetera. The current version of subparagraph (p) refers to hearing loss and internal system loss, but it has not since mid-1983 contained the language quoted by Lexington regarding serious permanent disfigurement "about the face or head."[6] Further, subparagraph (p) refers to indemnity, not to medical compensation. The cited statute is inapplicable, in either version, because Ms. Turner is not seeking permanent partial disability under paragraph (4) of La.R.S. 23:1221; she is seeking TTD under paragraph (1).

The record reveals that Ms. Turner is five feet six inches tall and weighs 135 pounds. The fat necrosis in this case concerns a movable bulge that causes pain when Ms. Turner sits, lies, or changes position. The surgery is

---

[5]In cases not falling within any of the provisions already made, where the employee is seriously and permanently disfigured or suffers a permanent hearing loss solely due to a single traumatic accident, or where the usefulness of the physical function of the respiratory system, gastrointestinal system, or genito-urinary system, as contained within the thoracic or abdominal cavities, is seriously and permanently impaired, compensation not to exceed sixty-six and two-thirds percent of wages for a period not to exceed one hundred weeks may be awarded. In cases where compensation is so awarded, when the disability is susceptible to percentage determination, compensation shall be established in the proportions set forth in Subparagraph (o) of this Paragraph.

La.R.S. 23:1221(4)(p) (in pertinent part).

[6]Prior to its 1983 amendment, La.R.S. 23:1221(4)(p), as quoted by Lexington, provided:

In cases not falling within any of the provisions already made, where the employee is seriously permanently disfigured about the face or head, or where the usefulness of a physical function is seriously permanently impaired, the court may allow such compensation as is reasonable and in proportion to the compensation hereinabove specifically provided in the cases of specific disability, not to exceed sixty-six and two-thirds per centum of wages during one hundred weeks.

reconstructive, not merely for the appearance of the scar or the indentation in the hip/thigh area. We note that plastic surgeons regularly provide wound care and grafting procedures in connection with injuries and surgeries performed by other specialists, and this is reflected in the jurisprudence. In particular, we note that as a result of a bruise and collection of blood under the skin (a hematoma which had become stagnant and clotted), a male claimant had a skin graft on his thigh by a plastic surgeon in *Fontenot v. Wal-Mart*, 08-158 (La.App. 3 Cir. 3/4/09), 5 So.3d 298, *writ denied*, 09-770 (La. 5/29/09), 9 So.3d 165. There, the wound, located five inches above the knee, had experienced tunneling deep into the groin area. The compensability of the surgery was not at issue on appeal, and we find the case illustrative of the jurisprudence discussing such procedures with no question as to compensability.

Lexington has cited no statute or jurisprudence in support of its assertion that such surgery is not compensable. Thus, the issue is causation and medical necessity. Dr. Atchison testified that the three pre-injury surgeries, the trauma injury, and the fourth surgery all combined to cause the need for the reconstructive surgery: "I think it's the first, the second, the third, the fourth, the trauma—all of it together that led to the fat saying okay, I've had enough, the need to send her to a plastic surgeon."

Dr. Taylor Theunissen, a Baton Rouge specialist practicing in the area of plastic and reconstructive surgery, saw Ms. Turner for consultation regarding a wide scar with pain symptoms at the left hip. He testified by deposition that due to the amount of indention at the top of the scar, he feared nerve damage or muscle separation from trauma or surgery. Another possibility is that the skin had become atrophic or thinned because of multiple surgeries, and the separation and thinning

15

of the skin and fat in the area caused the indention. Nerve damage was ruled out by EMG in September 2013, but the artificial joint foreclosed the possibility of an MRI of the musculature. There is also point tenderness at the bottom of the scar that could indicate a neuroma or a scarred or capsulated nerve. When asked, he clarified that radiating pain from back problems had nothing to do with point tenderness in the incision scar.

Dr. Theunissen testified that his plan is to excise the scar and explore the area for muscle integrity and nerve entrapment, making sure there is no neuroma present. If the muscle is detached, he can repair it if it is not too close to the joint. If the muscle is intact, he will reclose the skin that has been excised, and graft fat to fill the cavity. Dr. Theunissen indicated that the revision of the skin portion of the scar and the fat grafting are for aesthetic purposes, but the repair associated with the point tenderness and pain are not.

Following his deposition testimony favoring the surgery, Dr. Dole later indicated that he did not think the surgery was necessary. The trial court gave little or no weight to Dr. Dole's opinion on this issue, given that his specialty was pain management. The OWC found that the treatment recommendations of the two surgeons, Dr. Atchison and Dr. Theunissen, were medically necessary and reasonable and found the defendant responsible for the costs thereof. We find that the OWC's award of reconstructive plastic surgery was reasonable under the facts.

*Medication*

Lexington further contends that the trial court erred in ordering it to pay for anti-depressant medication that Ms. Turner was taking prior to the work injury. However, the record reveals that Dr. Dole did not prescribe Lexapro until a

year and a half after the accident. At his deposition in February 2014, Dr. Dole confirmed that he began treating Ms. Turner in 2008, after the (bi-polar) hip surgery, and had treated her for hip pain, stress, anxiety, and depression since then. He managed her medication for those issues as needed (e.g., changing her from Restoril to Xanax to Klonopin, and back again; he was also managing her Wellbutrin and pain medications).

In May 2013, Ms. Turner reported increased depression. Dr. Dole wanted to put her on Lexapro, but she said she could not afford it. He indicated that his treatment of Ms. Turner was approved by workers' compensation in December 2013, at which time he sought approval of the Lexapro. His March 2014 report indicated that Ms. Turner was on Lexapro and that her depression was stable. The OWC ordered Lexington to pay for Dr. Dole's treatment and prescribed medications arising from the work injury. We affirm this award.

*Penalties*

Lexington contends that the trial court erred in ordering it to pay penalties for: (1) arbitrary and capricious termination of indemnity benefits; (2) payment of indemnity benefits at the wrong rate; (3) failure to authorize plastic surgery; (4) failure to pay for anti-depressant medication; and (5) failure to order a functional capacity examination. The OWC awarded a $4,000.00 penalty for Lexington's arbitrary and capricious termination of Ms. Turner's TTD benefits under La.R.S. 23:1201(I), and it awarded a $2,000.00 penalty for each of the four failures to authorize benefits under La.R.S. 23:1201(F). We will address each award separately under the appropriate statutes.

17

In awarding $4,000.00 for the termination of Ms. Turner's TTD benefits under La.R.S. 23:1201(I),[7] the OWC analogized this court's decision in *Williams v. Tioga Manor Nursing Home*, 09-417 (La.App. 3 Cir. 11/18/09), 24 So.3d 970, *writ denied*, 10-298 (La. 4/9/10), 31 So.3d 389. There, the claimant was awarded $4,000.00 in penalties due to the employer's termination of her indemnity benefits and $4,000.00 for its discontinuance of the physician's treatment under La.R.S. 23:1201(I). Finding that Ms. Turner's medical benefits in general had not been terminated, the OWC limited the penalty to $4,000.00. We agree with this analysis. Lexington terminated Ms. Turner's indemnity benefits three days after Dr. Atchison withdrew his approval of the nurse aid training instructor position, stating that Dr. Atchison's letter of withdrawal did not change anything. Lexington has not pointed to an objective reason for terminating the benefits at the time of the termination, which is the crucial inquiry. *Williams*, 24 So.3d 970. Whether an employer is arbitrary and capricious is a finding of fact reviewed under the manifest error standard of review; and the actual amount of the penalty award is not to be disturbed absent an abuse of discretion. *Id*. We find no manifest error or abuse of discretion in the OWC's determinations regarding the $4,000.00 penalty for termination of indemnity benefits.

---

[7]Louisiana Revised Statutes 23:1201(I) provides:

> Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims. The provisions as set forth in R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provisions as set forth in R.S. 22:1892(C) shall be applicable to claims arising under this Chapter.

*Failure to Authorize Benefits*

The remaining four penalties were awarded for failure to authorize certain benefits pursuant to La.R.S. 23:1201(F).[8]

***Incorrect Rate***:  The OWC awarded $2,000.00 for Lexington's initial failure to pay Ms. Turner's TTD benefits at the correct rate.  Lexington paid those benefits using the same calculation it argued in its appeal, as discussed above, without giving her the forty-hour presumption of the full-time employee under La.R.S. 23:1021(13)(a)(i).  In the four full weeks preceding the accident, Ms. Turner actually worked a total of 116.7 hours because she was recovering from surgery and temporarily working reduced hours.  Citing La.R.S. 23:1021(13)(a)(ii), Lexington calculated Ms. Turner's AWW at $612.67 and her disability payment at $408.44.  We note that, even if subparagraph (13)(a)(ii) were the applicable subparagraph in this case, Lexington used only Ms. Turner's *naked* wages for the 116.7 hours preceding the accident.  It did not use any of the above-discussed benefits that Ms. Turner earned and received in calculating her AWW, in spite of

---

[8]Louisiana Revised Statutes 23:1201(F) provides in pertinent part:

Except as otherwise provided in this Chapter, failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim.  The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. . . .

. . . .

(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.

the mandate that any remuneration or reward for services should be included in fixing an employee's AWW. *Daigle v. Sherwin-Williams Co.*, 545 So.2d 1005 (La.1989).

Here, the employer knew, based upon the record and its own admissions, that Ms. Turner was a full-time employee who generally worked a forty-hour week. Therefore, the appropriate provision was La.R.S. 23:1021(13)(a)(i). The WCJ stated, "The argument of the employers is completely unacceptable given the *Hargrave* case and the information known by the employer, that Ms. Turner was a full-time employee and she's entitled to the presumption of 40 hours per week." We have already explained the *Hargrave* case and its applicability to this case, where it does provide relief, and where it does not provide relief. Lexington continues to give its own interpretation of the law, seeking to apply *Hargrave's* preclusion of adding certain fringe benefits, without applying *Hargrave's* application of the forty-hour presumption under La.R.S. 23:1021(13)(a)(i). As indicated, *Hargrave's* reason for precluding the *addition* of certain fringe benefits is that they have *already been included* in the forty-hour presumption. However, *Hargrave* does not prohibit the addition of fringe benefits under La.R.S. 23:1021(13)(a)(ii), which Lexington purports to apply.

Lexington has provided no evidence of having controverted the claim of withholding proper payments except its continuing insistence on appeal that Ms. Turner should have the worst of both worlds, no presumption, and no consideration of fringe benefits earned and received. We affirm the $2,000.00 penalty awarded by the OWC under La.R.S. 23:1201(F) for Lexington's failure to controvert Ms. Turner's claim that it paid TTD benefits at the wrong rate.

***Reconstructive Plastic Surgery*:**  The trial court awarded $2,000.00 for Lexington's failure to authorize the plastic surgery to reconstruct the area affected by the sinking of the incision and to repair the problems associated with the point tenderness which is causing Ms. Turner continuing pain and disability. We have already discussed Dr. Theunissen's testimony and the medical necessity and reasonableness of the surgery.  Lexington has offered no medical evidence to controvert the medical evidence supporting the surgery.  Dr. Atchison approved the surgery, and the defendant has failed to offer medical evidence that Dr. Theunissen's recommendation is unnecessary or unreasonable.  As previously discussed, the defendant has presented no legal authority to controvert the claim. Accordingly, we find no merit in this assignment of error.

***Medication*:**  The OWC awarded $2,000.00 for Lexington's failure to authorize payment for anti-depressant medication.  Lexington points to the deposition of Dr. Dole, arguing that Dr. Dole actually reduced Ms. Turner's medication following the accident instead of increasing it.  As previously discussed, the dates used by Lexington's attorney in deposing Dr. Dole were inaccurate and misleading at times.  For example, for several pages of the deposition, the attorney told Dr. Dole repeatedly that Ms. Turner applied for the job at Lexington in September of 2011, which is actually the date of the hip replacement *one year after* going to work for Lexington.  At one point Dr. Dole asked him to slow down because he was "spinning dates" at him too quickly. Moreover, the dates were often wrong.

On this particular issue regarding the anti-depressant medication, Lexington mistakes the *kind* of medication being discussed.  Lexington in its brief points to two pages in the deposition and states that Dr. Dole said he actually

decreased her medication after the accident and that "there was no change at all with respect to the dosage of her depression and anxiety medication." This is incorrect. On the first page referenced, Dr. Dole is asked to focus on December 7, 2011, the week before the accident, and he discusses, among other prescribed medications, the anti-depressant Wellbutrin, and the muscle relaxer Zanaflex. On the second page referenced, Dr. Dole is asked to discuss her next appointment, which is March 6, 2012, three months after the accident. When asked if he increased any medication at that time, Dr. Dole replied, "No. In fact, I discontinued her Zanaflex." When asked the reason, Dr. Dole responded that it likely "was not helping." Zanaflex was the muscle relaxer. There was no further discussion of antidepressants. The remainder of the lines referenced by Lexington discuss pain medication and pain scores.

We have already discussed in detail the Lexapro and its first appearance in conjunction with increased depression in 2013. Lexington has not controverted the claim for antidepressant medication. We affirm the penalty awarded on this issue.

*FCE:* The OWC awarded a $2,000.00 penalty for Lexington's failure to authorize an FCE to determine Ms. Turner's disability rating and what activities she could perform. Lexington asserts that this award was made in error because the FCE was not needed, as the claimant had already been released to sedentary work, and as the FCE is not medical treatment to which a penalty will be attached. We have already discussed the need for the FCE pursuant to the recommendations of Dr. Atchison and Dr. Goodman, Lexington's own choice of SMO. As to the second assertion, the jurisprudence indicates that penalties may be awarded for failure to authorize an FCE.

22

In *Alpizar v. Dollar General*, 13-1150 (La.App. 3 Cir. 3/5/14), 134 So.3d 99, where the claimant's request for an FCE was rebuffed by the employer, we affirmed the OWC's award of a $2,000.00 penalty for the employer's failure to authorize the FCE. Likewise, the second circuit in *Collins v. Patterson Drilling*, 39,668 (La.App. 2 Cir. 5/11/05), 902 So.2d 1264, affirmed a penalty for failure to authorize an FCE when requested by the IME (currently referred to as an SMO). There, the court concluded that without the FCE and further evaluation of the claimant's limitations, "the IME report is incomplete." *Id.* at 1269. Accordingly, we affirm the OWC's penalty award on this issue.

### Attorney Fees

The trial court awarded $15,000.00 in attorney fees for the work done by Ms. Turner's attorney through trial. In her answer to the appeal, Ms. Turner requests additional attorney fees of $7,500.00 for her attorney's work on appeal: responding to nine error assignments entailing three days of record review, research, dictation, and editing; plus an additional two days preparing for and traveling to oral argument. "An increase in attorney's fees is awarded on appeal when the defendant appeals, obtains no relief, and the appeal has necessitated more work on the part of the plaintiff's attorney, provided that the plaintiff requests such an increase." *McKelvey v. City of Dequincy*, 07-604, pp. 11-12 (La.App. 3 Cir. 11/14/07), 970 So.2d 682, 690. In *McKelvey* we awarded 3,000.00 for the work done on an appeal involving multiple error assignments. Here, seven years later, we find that attorney fees in the amount of $5,000.00 are warranted for the work done on the appeal in this case.

V.

## **CONCLUSION**

Based upon the foregoing, the judgment of the OWC awarding penalties, indemnity benefits, and medical treatment, including the discussed surgery and medication, is affirmed. We award attorney fees in the amount of $5,000.00 for the work done on appeal. Costs of this appeal are assessed to the defendant, Lexington House.

**AFFIRMED.**